Filed 5/21/25  In re L.R. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re L.R., a Person Coming Under the Juvenile Court Law. | B333926 (Los Angeles County Super. Ct. No. 23CCJP01720) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. GLENN K., Defendant and Appellant. | |

APPEAL from the judgment of the Superior Court of Los Angeles County, Mark A. Davis, Judge.  Affirmed.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Aileen Wong, Deputy County Counsel, for Plaintiff and Respondent.

* * * * * *

Glenn K. (father) appeals from a judgment declaring his son L.R. (born November 2021) a dependent of the court. Father challenges the juvenile court's jurisdictional finding of domestic violence as to both parents. We find substantial evidence supports the challenged finding; therefore we affirm the judgment.

## COMBINED FACTUAL AND PROCEDURAL BACKGROUND

**Initial investigation**

On January 18, 2023, the Clark County, Nevada child welfare agency filed a petition for child protection on behalf of L.R., alleging Erika R. (mother) neglected L.R., mother's mental health and/or drug use impacted her ability to care for L.R., mother lacked resources to provide for L.R.'s basic needs, and father abandoned L.R. by failing to have contact with mother and L.R. and failing to provide for financial support for the child.[1] The Clark County child welfare agency was unable to determine whether father posed other risks to the safety of L.R. due to lack of contact. L.R. was removed from mother on December 31, 2022.

On March 28, 2023, the Los Angeles County juvenile court accepted jurisdiction of this matter from Clark County, Nevada

---

[1] Mother is not a party to this appeal.

2

pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act (Fam. Code, § 3400 et seq.).

Although L.R. was detained in Nevada, mother reported they are residents of Los Angeles County, were homeless and previously stayed at the Salvation Army in Santa Monica, California. Shortly thereafter the child was detained in Nevada, and mother's and father's locations were unknown.

On the day of L.R.'s detention, mother had approached law enforcement claiming all of her possessions had been stolen at a McDonald's restaurant. Mother had no way to care for L.R., no support in the area, and no plan. Mother was informed L.R. could not sleep on the street, but no shelter could be provided to them. Mother became belligerent and threatened to throw hot coffee on the law enforcement officers. As an officer was entering the passenger side of a patrol vehicle, mother threw her cup of coffee at the vehicle. Mother was arrested, and L.R. was taken to a shelter.

Mother was released from custody on January 1, 2023, and her whereabouts were unknown for two days. Mother, who appeared to have mental health issues, was later found near a McDonald's restaurant. She was unable to provide a safe plan for L.R. and said they would be fine to sleep on the Las Vegas strip over the weekend. Mother claimed to be the child's pediatrician, and L.R. had only her breast milk as food despite being of an age where he should be consuming other forms of nutrition. The names of relatives provided by mother appeared to be fictitious, and they were unable to be located. L.R. remained detained in shelter care.

A Nevada social worker contacted the Salvation Army and met with mother's case manager, who confirmed mother

previously resided at the shelter. Mother and L.R. had moved in on February 10, 2022, and left on October 26, 2022. Mother did not advise the shelter she was leaving. The case manager contacted mother once to ask her to retrieve her belongings. Mother complied by retrieving a couple of items. The case manager believed mother had mental health problems. As to father, mother claimed he was abusive and the reason they were not together. The case manager never met father and had no information about him. Mother had listed no emergency contacts. The case manager observed that mother was not always honest.

On April 4, 2023, the social worker located father and the following day spoke with father's roommate, who reported mother had been staying with them but left the previous night. Mother and father were getting into many arguments and causing a lot of problems in the home. Mother was asked to leave and given a ride to the train station, where she said she was going to Georgia. The social worker asked the roommate to give father her business card.

On April 6, 2023, the social worker received a call from father, who did not know mother's whereabouts. He confirmed mother had showed up at his residence for a couple of days and said L.R. had been taken by a child welfare agency. Father had last seen L.R. a couple of months after his birth. Father and mother were together during mother's pregnancy, but then mother disappeared. Father had only seen L.R. two or three times.

Father admitted occasionally smoking marijuana and drinking alcohol. He denied violence between him and mother, saying he and mother would occasionally argue, but he always

4

would walk away before things got physical.  Father had two teenage children who resided with their mother in New York. Father denied any prior child welfare involvement.

On April 7, 2023, mother reported having arrived in Georgia with no plans to return to Los Angeles.  Mother was concerned about L.R. being released to father, saying father was violent towards her, and she and L.R. had a restraining order against father, though the restraining order might have expired and had not been renewed.  Mother stated father was verbally abusive and lashed out towards her while she was pregnant. Once, while she was pregnant, father headbutted her.  Mother did not want to talk about the situation further because it was traumatic.  Mother said father had never been involved in L.R.'s care, smoked cigarettes and consumed alcohol.  She heard he used cocaine, but was unsure.

On April 10, 2023, father advised the social worker he had a six-month old daughter, Juliana C., but did not know where his daughter's mother, Tina, had taken the baby.  Father also said, "it happened after she disappeared and left when she was pregnant then it happened again and now I am at this point where all I want is at least be a part of my children [*sic*] life."

L.R. remained in a foster home in Nevada.

**Petition, detention and reports**

On May 18, 2023, the juvenile court exercised its discretion pursuant to Welfare and Institutions Code section 331 and ordered the Los Angeles County Department of Children and

Family Services (DCFS) to file a section 300 petition on behalf of L.R.[2]

On May 22, 2023, a section 300 petition was filed on behalf of L.R., alleging pursuant to section 300, subdivision (a), count one: "On a prior occasion, the child [L.R's] mother . . . and the child's father . . . engaged in a violent altercation in which the father struck the mother's head with the father's head when the mother was pregnant with the child. . . . Such violent conduct on the part of the father against the mother endangers the child's physical health and safety, creates a detrimental home environment, and places the child at risk of serious physical harm, damage and danger." Pursuant to section 300, subdivision (b), count one, the petition alleged mother had mental and emotional problems rendering mother unable to provide regular care for the child. Count b-2 set forth the same domestic violence allegations alleged in count a-1.

At the May 23, 2023 detention hearing, the juvenile court found father to be the alleged father of L.R. Father's request for custody was denied and L.R. was ordered detained from parental custody.

In the June 28, 2023 jurisdiction/disposition report, the dependency investigator reported that on June 7, 2023, L.R. was brought to Los Angeles and placed with a foster mother.

The dependency investigator was also able to locate a restraining order protecting mother, but it did not name father as the restrained party. Father denied having been served with or having any knowledge of a restraining order against him. The

---

[2] All further statutory references are to the Welfare and Institutions Code.

6

dependency investigator was unable to locate mother for an interview.

Father denied any violence with mother, including hitting mother's head while she was pregnant. He had no criminal history for domestic violence. When asked why mother would say he hit her, father claimed she is an angry individual and for an unknown reason does not want him to have their son.

Father admitted to having arguments with mother that almost became physical and that mother slapped him a couple of times, but he claimed to have kept his composure and left the house. Father believed mother was trying to provoke him to hit her so anytime things became too aggressive or overwhelming, he grabbed his belongings and left.

Father described an incident during which mother took a vendor's items without paying. The vendor talked to father, who asked mother about it. Mother became upset, started to scream, and threw the stolen goods on the table. The vendor then offered mother the stolen items prompting mother to become more upset. She then refused the items, and attempted to flip the table. Father held the table down while mother walked away cursing.

Maternal uncle, Marcus R., denied any knowledge of the identity of L.R.'s father. He was unaware of any violence between mother and any partner. Marcus had no concerns regarding mother's mental health and denied knowledge of mother having panic attacks, making bizarre statements, or exhibiting aggressive behavior.

The maternal great-aunt/adoptive maternal grandmother, Angela W., stated she knew L.R.'s biological father. According to Angela, mother informed Angela that mother allowed father to see L.R. when he was born, but mother had concerns about father

not having a stable home. Mother had never spoken to Angela about domestic violence with father; however, Angela was not privy to all of mother's secrets—noting mother had not informed Angela of L.R. having been detained. Angela saw no signs of abuse to mother nor did she see anything that alerted her to any abuse. Angela also denied knowledge of mother making bizarre statements, having panic attacks, or being aggressive.

Mother's previous case manager at Salvation Army said mother disclosed that father was abusive. When father came on the property, mother left the shelter because she did not feel comfortable with father knowing her location. Late one night mother grabbed her belongings, went to a motel, and reached out to explain she had left because father knocked on her door. While mother was in the shelter, she did not have visitors. Another individual, who brought father to the shelter, was in the same program with mother and claimed to be aware father was abusive to mother. The case manager denied mother had ever mentioned a restraining order. Mother spoke little about father and did not disclose any domestic violence with father until after he came to the shelter.

The former case manager had no concerns regarding mother's mental health. She had not observed mother having panic attacks, acting bizarrely or aggressively. Mother was always calm even when she was upset.

Fatima B., mother of father's older children, denied any violence between her and father. She and father did not fight or have arguments.

The social worker for father's child, Juliana C., reported that Juliana's mother had not mentioned domestic violence involving father.

8

As of June 27, 2023, mother's whereabouts remained unknown.

An August 2, 2023 last minute information for the court reported mother had contacted the social worker on July 27, 2023, stating she had a job in Atlanta, but returned to Los Angeles for L.R.'s dependency case.

Mother claimed she once had a restraining order against father due to the headbutting incident described in the section 300 petition, though she did not have a copy of the order. Mother did not file it herself but had a homeless advocate fill it out on her behalf. Mother did not go to court in connection with the restraining order against father. Mother disclosed having a history of being in relationships where there was violence between her and her partner.

Mother recounted two incidents involving violence with father. Both occurred before L.R. was born, though mother could not recall the dates.

The first incident occurred before she became pregnant. Mother admitted the incident was "probably her fault." She and father were verbally arguing, thinking father was going to hit her, she hit him first.

The second incident happened while she was pregnant. Mother and father were arguing and yelling when father headbutted her. Mother reacted by pulling father's hair and trying to pull out his dreadlocks. Mother indicated father had said some hurtful things to her, without providing further detail about the incidents. Mother denied mental health issues, but admitted to having anxiety and that she threw coffee at the police officers in Las Vegas. She denied making bizarre statements to authorities in Las Vegas.

The August 2, 2023 last minute information for the court contained father's report that mother stopped by his home, but they did not talk about the dependency proceeding because he did not want to make mother upset at him. The social worker opined father lacked the tools to have appropriate conversations with mother without mother escalating and becoming upset. Father allowed mother to visit and stay at his home and to participate in a zoom video call with L.R. The social worker also noted mother disclosed violence with father but would stay with him when she visited Los Angeles.

On August 29, 2023, the dependency investigator reported a dependency petition had been filed on behalf of father's daughter, Juliana C. Father was nonoffending in the petition.

A September 7, 2023 last minute information for the court reported the dependency investigator had made contact with biological maternal grandmother, Marion S., who denied mother ever disclosed to her any domestic violence with father. She also denied mother displaying any mental health problems, having panic attacks or acting aggressively.

In an October 16, 2023 last minute information for the court, the dependency investigator reported father did not have a dependency history in New York.

**Adjudication**

The adjudication and disposition hearing regarding L.R. was held on October 16, 2023. Father was present by speakerphone. The court admitted DCFS's reports into evidence and took judicial notice of all prior petitions, case plans and court orders.

L.R.'s counsel argued the court should sustain the domestic violence count based on mother's statements, noting while father

10

denied domestic violence, he admitted mother slapped him and punched him, and provoked him to hit her. For those reasons, L.R.'s counsel asked the court to sustain count b-2.

Father's counsel asked the court to dismiss counts a-1 and b-2, both of which alleged domestic violence, due to lack of evidence. Father's counsel noted mother was an unreliable witness, stating mother had "extreme mental health issues" and "is constantly making up stories about who she is and speaking erratically." Counsel pointed out no other witness reported observing or hearing about any abuse or violence between the parents.

The juvenile court sustained counts b-1, concerning mother's mental and emotional problems, and b-2, concerning domestic violence between the parents. The court found DCFS met its burden of providing sufficient evidence to make the findings.

The court declared L.R. a dependent of the court under section 300, subdivision (b), ordered L.R. removed from parental custody, ordered family reunification services for the parents, and set the matter for a six-month review hearing.

On December 15, 2023, a notice of appeal on behalf of father was filed by his counsel.

## DISCUSSION

### I. Whether father's appeal is justiciable

The parties disagree whether father's appeal is justiciable. Father's sole argument on appeal is the evidence did not support the domestic violence count as to him. Father acknowledges that jurisdiction would remain based on the unchallenged counts as to mother regardless of the outcome of this appeal. DCFS argues

11

this court should dismiss father's appeal because this court cannot provide father with any effective relief. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1490 ["An important requirement for justiciability is the availability of 'effective' relief—that is, the prospect of a remedy that can have a practical, tangible impact on the parties' conduct or legal status."].)

Under the doctrine of justiciability, reversal and remand is not required if one or more of several findings made by the juvenile court is unsupported by substantial evidence. (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 876.) "'We uphold judgments if they are correct for any reason, "regardless of the correctness of the grounds upon which the court reached its conclusion."'" (*Ibid.*) "'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

However, an exception exists where the outcome of the appeal could be "'the difference between father's being an "offending" parent versus a "non-offending" parent.'" (*In re Quentin H.* (2014) 230 Cal.App.4th 608, 613.) An appellate court may find it appropriate to exercise its discretion to hear the appeal on the merits in this situation, particularly where the finding could result in consequences for the parent in this or other dependency proceedings. (*Ibid.*)

12

Here, the true finding regarding domestic violence is the difference between father being an offending or a nonoffending parent. Thus, the finding could have consequences in this or other dependency or family law proceedings. We note father has another child who is the subject of a dependency petition. Thus, the finding could affect him even if there remain grounds for jurisdiction of L.R. due to mother's neglect. For these reasons, we exercise our discretion to review father's appeal on the merits.

## II. Applicable law and standard of review

Jurisdiction is warranted under section 300, subdivision (b)(1), if the child has suffered, or there is a substantial risk the child will suffer serious physical harm or illness as a result of the failure of his parent to adequately supervise or protect the child. In order to make the necessary showing, three elements are required: (1) neglectful conduct or an inability to protect the child; (2) causation; and (3) serious physical harm or injury to the minor, or a risk of such harm. (*In re Joaquin C.* (2017) 15 Cal.App.5th 537, 560–561.) A current risk of harm may be shown by past conduct if there is reason to believe the conduct will recur. (*In re S.F.* (2023) 91 Cal.App.5th 696, 712–713.)

We review a challenge to a jurisdictional finding for substantial evidence. (*In re I.C.* (2018) 4 Cal.5th 869, 892.) "Substantial evidence is a deferential standard, but it is not toothless. It is well settled that the standard is not satisfied simply by pointing to "'isolated evidence torn from the context of the whole record.'"" (*Ibid.*) "Rather, the evidence supporting the jurisdictional finding must be considered "'in the light of the *whole record*'" 'to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value . . . .'" (*Ibid.*)

If there is substantial evidence to support the juvenile court's findings, we uphold those findings. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) "We do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts. Rather, we draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion." (*Ibid.*)

## III. Substantial evidence supports the juvenile court's finding

Reviewing the evidence in light of the whole record, we find substantial evidence supports the juvenile court's decision sustaining the domestic violence count.

Mother has consistently stated there was domestic violence between her and father. Mother articulated two instances of violence: first, an incident in which she anticipated father would hit her so she hit him first; and second, an incident in which father headbutted her while she was pregnant. In this second incident, mother reacted by pulling on father's hair and trying to pull it out. While father denied being the instigator of violence, he admitted that mother slapped him a couple of times.

Further, prior to the commencement of these proceedings, mother had informed her former caseworker at Salvation Army that father was physically abusive. When father came on to the shelter's property, mother left the shelter as she did not feel safe with father knowing her location. Mother later reached out to explain her reasons for having left the shelter. Mother also revealed the domestic violence to at least one other individual at

14

the shelter. This testimony, along with mother's consistent allegations of abuse, constitutes substantial evidence.

A current risk of harm exists. Father allowed mother to stay with him when she was in Los Angeles, and father's roommate reported mother and father were engaged in many arguments and caused problems in the home. Father admitted mother stopped by his home and the two continued to see each other. Mother had a history of relationships with domestic violence. The social worker observed that father did not have the skills to effectively communicate with mother without the conversation escalating.

Father argues there was a plethora of evidence suggesting the domestic violence did not occur. Father argues mother had mental health issues, manifesting an inability to accurately describe reality. However, we cannot reevaluate the credibility determinations of the juvenile court. (*In re L.Y.L., supra*, 101 Cal.App.4th at p. 947.) Mother's consistent statements to more than one individual that father acted violently towards her constituted substantial evidence. In addition, father's own admission that mother slapped him a couple of times constitutes evidence of domestic violence between mother and father.

Father points out that various maternal relatives who were interviewed did not report being aware of any domestic violence in mother's relationship with father. However, the juvenile court was not required to view this evidence as undermining mother's own testimony and that of her former case worker. Similarly, father's lack of a history of domestic violence does not require a finding that no domestic violence occurred in this case.

"Evidence from a single witness, even a party, can be sufficient to support the trial court's findings." (*In re Alexis E.*

15

(2009) 171 Cal.App.4th 438, 451.)  In this case, mother's testimony provides such evidence.  Under the circumstances, we must uphold the juvenile court's findings, even if other evidence supports a contrary conclusion.  (*In re L.Y.L., supra,* 101 Cal.App.4th at p. 947.)

## DISPOSITION

The judgment is affirmed.


                                        CHAVEZ, J.

We concur:


LUI, P. J.


ASHMANN-GERST, J.